ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
swilliams@rgrdlaw.com
     – and –
DAVID C. WALTON (167268)|
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davew@rgrdlaw.com
bcochran@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROL E. NICK, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> VELODYNE LIDAR, INC. f/k/a GRAF INDUSTRIAL CORP., ANAND GOPALAN, ANDREW HAMER, JAMES A. GRAF, MICHAEL DEE, OC OPPORTUNITIES FUND II, L.P., OWL CREEK ASSET MANAGEMENT, L.P. and GRAF ACQUISITION LLC, <br><br> Defendants. | Case No.  3:21-cv-1950 <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Carol E. Nick ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon information and belief as to the investigation conducted by plaintiff's counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Velodyne Lidar, Inc. f/k/a Graf Industrial Corp. ("Velodyne" or the "Company") and securities analyst reports, press releases, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of all purchasers of Velodyne securities (the "Class") between July 2, 2020 and March 17, 2021, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331, because this is a civil action arising under the laws of the United States of America.

3. Venue is proper in this District under §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b)-(d). The Company maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

4. In connection with the acts alleged in this complaint, defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the Nasdaq Stock Market LLC ("Nasdaq"), a national securities exchange.

**PARTIES**

5.      Plaintiff Carol E. Nick, as set forth in the accompanying certification incorporated by reference herein, purchased Velodyne securities during the Class Period and has been damaged thereby.

6.      Defendant Velodyne is a purveyor of lidar solutions for autonomous vehicles, driver assistance, delivery, robotics, navigation, mapping and other uses.  Velodyne common stock and warrants trade on the Nasdaq under ticker symbols "VLDR" and "VLDRW," respectively. Prior to the Merger (defined below), Velodyne stock, warrants and ownership units traded under the symbols "GRAF," "GRAFW" and "GRAFU," respectively.  The Company is headquartered in San Jose, California.

7.      Defendant Anand Gopalan ("Gopalan") is the President and Chief Executive Officer ("CEO") of Velodyne.

8.      Defendant Andrew Hamer ("Hamer") is the Chief Financial Officer ("CFO") of Velodyne.

9.      Defendant James A. Graf ("Graf") is the former CEO of Velodyne.  He also served as a director of Velodyne until his February 2021 resignation.

10.     Defendant Michael Dee ("Dee") is the former President and CFO of Velodyne and a current member of the Board of Directors of the Company (the "Board").

11.     Defendant OC Opportunities Fund II, L.P. ("OC Opportunities") is an investment fund owned and controlled by defendant Owl Creek (defined below).

12.     Defendant Owl Creek Asset Management, L.P. ("Owl Creek") is a hedge fund based in New York City.  Defendant Owl Creek owned and controlled the blank check sponsor of Velodyne, as detailed below, together with defendants Graf and Dee, through defendant OC Opportunities.

13.     Defendant Graf Acquisition LLC ("Graf Acquisition") is owned and controlled by defendants Graf, Dee and Owl Creek.  Defendant Graf Acquisition served as the blank check sponsor of Velodyne.

14.     Defendants OC Opportunities, Owl Creek and Graf Acquisition are collectively referred to herein as the "Blank Check Sponsor Defendants."

15.     Defendants Gopalan, Hamer, Graf and Dee are collectively referred to herein as the "Individual Defendants."  Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about Velodyne's business, operations, services, acquisition plans, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

16.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition plans, and present and future business prospects, as alleged herein.  In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

17.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the Nasdaq, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares would be based upon truthful and accurate information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

18.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various

SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

19.     Each defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Velodyne securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (a) deceived the investing public regarding Velodyne's business, operations, services, and present and future business prospects; (b) enabled Velodyne to complete an initial business combination, thereby triggering lucrative incentive payouts for certain Company insiders, as detailed herein, during the Class Period; and (c) caused plaintiff and the Class to purchase Velodyne publicly traded securities at artificially inflated prices.

**SUBSTANTIVE ALLEGATIONS**

20.     Velodyne began as Graf Industrial Corp. ("Graf Industrial"), a blank check company formed by defendant Graf. A blank check company is sometimes referred to as a special purpose acquisition vehicle, or "SPAC," and does not initially have any operations or business of its own. Rather, it raises money from investors in an initial public offering and then uses the proceeds from the offering to acquire a business or operational assets, usually from a private company that does not publicly report financial or operating results. As a result, investors in blank check companies rely on the skill, transparency and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

21.     On or about October 16, 2018, Graf Industrial completed its initial public offering, selling 24.4 million ownership units (including a partial over-allotment) to investors for gross proceeds of $244 million (the "IPO"). Each unit consisted of one share of common stock and one

redeemable warrant.  The IPO was sponsored by defendant Graf Acquisition, a strategic advisory firm owned and controlled by defendants Graf, Dee, Owl Creek and other Company insiders.

22.     While Graf Industrial did not identify any target companies at the time of the IPO, the IPO offering materials stated that the Company planned to pursue an acquisition focused in the diversified industrials sector.  IPO offering materials claimed that defendants Graf, Dee and the Blank Check Sponsor Defendants would "bring a unique rigor to the process of identifying and consummating an initial business combination that will be well-received in the public markets, and to create value over time for our stockholders following an initial business combination."

23.     The IPO offering materials provided "Business Combination Criteria" that Graf Industrial would purportedly use to evaluate target companies, which included the following:

- Leading Industry Position with Supportive Long-Term Dynamics and Competitive Market Advantage. . . .

- Stable Free Cash Flow, Prudent Debt and Financial Visibility. . . .

- Benefit Uniquely from a Business Combination with a Special Purpose Acquisition Company, ideally where a Business Combination with a Special Purpose Acquisition Company is the Preferred Course of Action. . . .

- Sourced on a Proprietary Basis. . . .

- Committed and Capable Management Team. . . .

- Potential to Grow, including Through Further Acquisition Opportunities. . . .

- Preparedness for the Process and Public Markets. . . .

24.     Pursuant to the IPO prospectus, Graf Industrial was required to acquire a target business with an aggregate fair market value of at least 80% of the net assets held in trust from the IPO proceeds and to do so within 18 months of the October 2018 IPO.  In the event Graf Industrial did not complete an initial business combination, the Company was obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interest.  Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction.  If enough shareholders redeemed their shares, a deal would not be economically feasible.

25. However, if Graf Industrial was successful in completing an initial business combination within the allotted time frame, defendants Graf, Dee, the Blank Check Sponsor Defendants and various Company insiders would be richly rewarded. Specifically, Graf Industrial had issued founder shares to Graf Acquisition in connection with the IPO equal to approximately 20% of the Company's outstanding common shares after the IPO, which Graf Acquisition held for the benefit of defendants Graf, Dee, Owl Creek and their affiliates. These founder shares were worth approximately $72 million by September 2020, but would expire worthless if the Company failed to complete its initial business combination. As a result, defendants Graf, Dee and the Blank Check Sponsor Defendants were highly incentivized to complete an initial business combination and to convince shareholders to approve the Merger.

26. In April 2020, as Graf Industrial's deadline to complete an initial business combination approached, the Company stated that it was in negotiations to acquire a polypropylene recycling company, PureCycle Technologies LLC. When this deal failed to materialize, Graf Industrial filed an amendment to its certificate of incorporation to extend the date by which the Company needed to complete a business combination, from April 18, 2020 to July 31, 2020.

27. On June 26, 2020, several media outlets reported that Graf Industrial was in talks to acquire Velodyne Lidar Inc. ("Velodyne Target").

28. On July 2, 2020, Graf Industrial issued a release announcing that it had entered into a merger agreement with Velodyne Target, to be funded by cash and new stock issuances, that valued the combined Company at $1.8 billion (the "Merger"). As a result of dilution, Graf Industrial's existing stockholders would own only an estimated 6.5% of the combined Company following the Merger.

29. Velodyne Target specialized in lidar technologies for a range of applications. Lidar is a method for measuring distances using laser light. It is commonly used to make high-resolution maps and is a key feature in developing certain autonomous car technologies. The Company's release described Velodyne Target as a "pioneer" in the lidar field and highlighted the continued leadership of its "founder and industry icon," David Hall ("Hall"), as well as the large equity stake that would purportedly continue to be held by Ford Motor Co. ("Ford") following the Merger. The

release represented that Velodyne was experiencing tremendous growth and on track to achieve $100 million in revenues in 2020 and $680 million in revenues by 2024.

30.     On July 23, 2020, Graf Industrial shareholders once again voted to extend the deadline, from July 31, 2020 to October 31, 2020, in order to provide sufficient time to consummate the Merger.

31.     On August 31, 2020, Graf Industrial issued a release reaffirming Velodyne Target's revenue trajectory, stating that the Company would achieve $101 million in revenues in 2020 and that the Company's long-term contracted revenues had increased by 8% since the deal was first announced.

32.     On September 14, 2020, defendants issued the final proxy statement for the Merger, which urged shareholders to vote in favor of the deal and (as detailed below) contained numerous materially false and misleading statements and omissions (the "Proxy").  Specifically, the defective Proxy misrepresented Velodyne's business, financials and prospects, claiming, *inter alia*, that: (a) Hall would maintain leadership of Velodyne Target; (b) Ford would maintain a significant equity stake; (c) Velodyne Target was continuing to achieve considerable revenue growth and on track to achieve over $100 million in 2020 revenues; and (d) this growth rate was secure because of the high percentage of revenues already awarded under existing contracts.

33.     On the basis of the defective Proxy, on September 29, 2020, shareholders voted to approve the Merger at a special shareholders meeting.  Following the consummation of the Merger, Graf Industrial changed its name to Velodyne.

34.     On January 7, 2021, Velodyne issued a release providing preliminary fourth quarter and full year 2020 financial results.  The release stated that the Company had only achieved between $15.5 million and $16 million in revenues during the fourth quarter and that full-year revenues only totaled $94 million, or approximately 30% less for the fourth quarter than represented in the Proxy.  The Company also withdrew any future guidance, notwithstanding defendants' earlier representations about long-term committed revenues.

35.     On this news, the price of Velodyne stock and warrants fell 7% and 13%, respectively.

36.    On February 12, 2021, Ford filed with the SEC a statement of ownership on Form SC 13G/A which revealed that Ford had sold its entire Velodyne stake.

37.    On this news, the price of Velodyne stock and warrants fell 8% and 12%, respectively.

38.    On February 22, 2021, Velodyne issued a release which stated that Hall had been removed as Chairman of the Board and his wife, Marta Thoma Hall, had been replaced as the Company's Chief Marketing Officer.   The release stated that an internal investigation had concluded that the couple had "each behaved inappropriately with regard to Board and Company processes, and failed to operate with respect, honesty, integrity, and candor in their dealings with Company officers and directors."  The Board also formally censured the couple and directed them to receive "appropriate remedial training."  Hall was replaced as Chairman by his brother-in-law, Joseph Culkin.   The Halls responded to the Company's actions by describing them in public statements as an "ambush" and "power grab" designed by Velodyne executives to cut them out of Company leadership.

39.    On this news, the price of Velodyne stock and warrants fell 15% and 20%, respectively.

40.    On February 25, 2021, Velodyne issued a release providing final fourth quarter and full year 2020 financial results.  The release largely confirmed the disappointing revenue results previously released by the Company.  During the accompanying earnings call, defendant Gopalan stated that the Company had lost multiple contracts to competition, with analysts later identifying Ford as likely one of the contracts lost by the Company.  Similarly, defendant Hamer revealed that the weighted average price for Velodyne products had plummeted one third during the year. Confirming that defendants knew of these adverse trends during the Class Period, when asked by an analyst whether anything had changed given the significant difference between the Company's prior outlook and latest disclosures, defendant Gopalan stated: "[W]e have always had a clear and clearer understanding of where the end cost of the technology needs to get to for all of these different applications to enable mass market adoption. . . .  So, no, nothing has really changed in terms of outlook."

41.     On March 15, 2021, Velodyne issued a release announcing that it had hired a new Chief Operating Officer ("COO"), James Barnhart, effective immediately.

42.     On March 17, 2021, Velodyne filed its annual report with the SEC on Form 10-K. In the annual report, Velodyne revealed that the Company was suffering from multiple material weaknesses in its internal controls over financial reporting, including weaknesses related to: (a) Velodyne's processes and controls over tracking and reporting whistleblower complaints and litigation matters; and (b) Velodyne's failure to adequately review revenue schedules associated with non-standard revenue arrangements, which resulted in misstatements of revenue and deferred revenue for the three months ended December 31, 2020.

43.     Also on March 17, 2021, Velodyne filed a current report with the SEC on Form 8-K.  The Form 8-K revealed that the Company's former COO, Thomas Tewell, had resigned on March 14, 2021.

44.     On this news, the price of Velodyne stock and warrants fell 13% and 17%, respectively, over three trading days.

45.     Defendants' materially false and misleading statements during the Class Period about Velodyne's business and operational trends and results, as detailed herein, were made willfully and with reckless disregard for the truth, causing Velodyne securities to trade at artificially inflated prices.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

46.     The Class Period begins on July 2, 2020.  On that date, Graf Industrial and Velodyne Target issued a joint release announcing the Merger agreement ("Merger Release").  The release highlighted the purportedly "[u]nparalleled leadership" of Velodyne Target's lidar technologies and stated that it was on track "to generate revenues of approximately $100 million in 2020, increasing to approximately $680 million in 2024 with existing contracts expected to drive just under 50% of the estimated 2024 revenues."  The release also stated that "[e]stimated revenues under existing customer contracts are expected to exceed $800 million from 2020 to 2024."  The release continued in pertinent part as follows:

As a first-mover, Velodyne has been able to establish several defendable moats around its business, including customer entrenchment, an extensive patent portfolio, a broad product offering and commercial scale manufacturing capabilities. Proprietary manufacturing innovations and manufacturing partnerships with Nikon Corporation, Fabrinet and Veoneer, Inc. continue to lower the cost of production and allow for the development of new lower cost products, enable mass market adoption and a significantly expanded total addressable market ("TAM"), while maintaining robust margins. Strong customer relationships established over time and ownership of protected technology provide clear differentiation in the market. Following the transaction, Velodyne will have significantly greater financial flexibility to execute on its strategic growth initiatives, as well as leverage its proven operating platform.

47. In addition, the Merger Release highlighted the continued input of Hall and early stage investors such as Ford. The release stated: "David Hall will continue to play a critical role as executive chairman of Velodyne." It similarly represented that "[c]urrent Velodyne shareholders, including David Hall and strategic investors Ford, Baidu, Inc., Nikon Corporation and Hyundai Mobis, will retain an equity interest of more than 80% in the combined company."

48. The Merger Release quoted several of the Individual Defendants regarding the proposed transaction, including defendants Gopalan, Graf and Dee. The release stated in pertinent part as follows:

Dr. Anand Gopalan, CEO of Velodyne, said, "Partnering with Graf Industrial will provide the opportunity to enhance our leading position in the lidar and sensor markets broadly around the world, creating new and exciting opportunities for our customers and employees. We will continue to focus on executing our strategic plan to deliver strong and disciplined growth, while realizing attractive returns through prudent capital management."

James Graf, CEO of GRAF, said, "We are tremendously excited by the opportunity to partner with David Hall and Velodyne. The leadership team, led by Dr. Anand Gopalan and Drew Hamer, has done an outstanding job in preparing the Company for the inflection point of lidar and becoming a public company. We're especially excited by Velodyne's potential to greatly improve vehicle safety by augmenting ADAS systems and help leading e-commerce companies and others realize autonomous last-mile delivery."

Michael Dee, president and CFO of GRAF, said, "There is no reason we won't see – and insurance companies won't demand – lidar system in every vehicle for safety, now that Velodyne has been able to drive the costs down through relentless manufacturing process improvements. We also believe the Company's differentiated and scalable operating platform make the economics of selective consolidation hugely compelling."

49. On August 31, 2020, Graf Industrial issued an update on the Merger. The release stated that Velodyne Target's "2020 revenue guidance and outlook through 2024 are reaffirmed."

The release also stated that the amount of revenues under contract for Velodyne Target had substantially increased since the Merger was announced, stating: "Velodyne's customer agreements represent approximately $970mm in expected revenue through 2024, a $130mm increase from time of initial transaction announcement on July 2, 2020." The release continued in pertinent part as follows:

> Velodyne reaffirmed its $101mm 2020 revenue guidance and multi-year revenue outlook through 2024. The proportion of the future revenue outlook supported by customer agreements has increased as the number of multi-year agreements entered into by Velodyne has increased to 18 (+2) since the announcement of the proposed business combination on July 2, 2020 (the "announcement"), with approximately 56% (+8% since the announcement) of the 2024 revenue outlook now represented by customer agreements. Customer agreements now represent a total of approximately $970mm of revenue through 2024, an increase of approximately $130mm since the announcement.

50.     On September 14, 2020, Graf Industrial filed with the SEC the Proxy for the Merger. The Proxy stated that the Board recommended that shareholders vote to approve the Merger at the special meeting of shareholders scheduled for September 29, 20202. The purported reasons provided for approving the Merger stated in the Proxy included, *inter alia*, Velodyne Target's: (a) "Leading Industry Position with Supportive Long-Term Dynamics and Competitive Market Advantage"; (b) "Stable Free Cash Flow, Prudent Debt and Financial Visibility"; and (c) "Clear Use of Proceeds and SPAC as Preferred Course of Action," in particular "because Velodyne can provide forward-looking guidance and talk more directly about projections for future years that are backed by existing customer contracts." The Proxy also represented that Velodyne Target had "in place the governance, financial systems and controls required in the public markets . . . , as well as corporate governance, financial systems and controls in place to operate as a public company."

51.     The Proxy represented that Velodyne Target was on track to achieve over $101 million in revenues in 2020, which would grow to over $680 million in revenues by 2024. The Proxy stated that this growth rate was secure in part because 48% of projected 2024 revenues were already under existing awarded multi-year contracts. The Proxy stated in pertinent part as follows:

> Velodyne Management estimates that Velodyne's revenue will have a compound annual growth rate from 2020 to 2024 of 61% and that Velodyne will

have an adjusted EBITDA margin of more than 20% in 2024, prior to incorporating the impact of any acquisitions. . . .

. . . Approximately 48% of projected 2024 revenues are under existing awarded multi-year contracts. . . .

As a result of the Business Combination, future acquisition opportunities and the synergies that could be realized from each of these, Velodyne Management estimates that Velodyne's platform has the opportunity to increase in size. . . .

Below is a summary of the key financial projections used as a basis to determine valuation.

| ($ in millions)<br>Year | Revenues | ADJUSTED<br>EBITDA | Free<br>Cash Flow |
|---|---|---|---|
| 2020 | $101.2 | $ (59.3) | $ (59.6) |
| 2021 | $152.0 | $ (7.5) | $ (4.1) |
| 2022 | $249.4 | $ 15.5 | $ 6.6 |
| 2023 | $412.1 | $ 56.7 | $ 29.9 |
| 2024 | $684.1 | $148.8 | $103.7 |

52.     The Proxy also highlighted the experience, leadership and continued close involvement of Hall in the post-combination Company as a primary reason for the Merger, stating in pertinent part as follows:

*Committed and Capable Management Team.*     The Board considered that Velodyne has a professional management team whose interests are aligned with those of our stockholders and can clearly and confidently articulate the business plan and market opportunities to public market investors. Founder and Executive Chairman David Hall is an industry icon having invented real-time 3D lidar in 2005.

*                *                *

*Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management*.

Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and he remains deeply involved in all aspects of Velodyne's business, including product development. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.

1

\*     \*     \*

2     Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader.  Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA).  In the 2007 DARPA Grand Challenge, Velodyne's lidar sensors were used by five of the top six finishers.  In a historic engineering milestone, Mr. Hall invented a lidar sensor that could see and measure the vehicle's surroundings with unprecedented precision, enabling the vehicle to navigate autonomously.  This revolutionary design included a solid-state mechanism with an array of lasers and detectors which offered vast improvements in performance and reliability over the legacy practice of separately interfacing hundreds of fragile parts.  The success of Mr. Hall's invention has spurred significant investment and focus in autonomous development, and a wide range of applications for lidar technology has since emerged.  Innovation is an important component of our design heritage, and we currently have key patents in real-time 3D vision for autonomous systems.  Our smart vision technology has become the reference architecture in applications requiring precise real time 3D perception.

David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia.

53.    The Proxy further represented that Ford would retain a significant equity interest in Velodyne Target following the Merger, stating: "Ford is expected to hold greater than 5% of the Company's outstanding common stock after the Business Combination."  The Proxy also highlighted Ford as a major customer of the Company, stating: "Ford Motor Company has been a Velodyne customer since 2015."

54.    On November 5, 2020, Graf Industrial, which had been renamed Velodyne following the September 2020 Merger close, issued a release announcing its third quarter 2020 financial results ("3Q20 Release").  The release stated that Velodyne had grown revenues 137% year-over-year to $32.1 million and continued to grow its contracted revenues, signing 6 "multi-year agreements during the quarter," which increased the total to 24 long-term contracts.  Defendant Gopalan was quoted in the release as stating that the Company was experiencing "continued strength . . . in the overall lidar markets."  He continued: "Despite the continued impacts of Covid-19, we see growing interest in lidar applications across multiple industries, as evidenced by our accelerating commercial success across all of our focused markets.  In this environment, Velodyne continues to demonstrate its leadership as the only at-scale lidar player, through strong technical and business execution."

55.    The 3Q20 Release also reaffirmed the Company's purported revenue trends, stating in pertinent part as follows:

Velodyne is pleased to reiterate the guidance shared in early September, as part of our business combination with Graf Industrial Corp.

- For the full year 2020, we expect total revenue of approximately $101 million, as previously forecasted.

- We expect the full year GAAP gross margin, including approximately $7.5 million of stock-based compensation, in the range of 22.6% to 25.6% and the non-GAAP gross margin to be approximately 30% to 33%.

- For the full year, GAAP operating loss is expected to total between $208 million and $205 million.  Non-GAAP operating loss is expected in the range of $67 million to $64 million for the full year of 2020. . . .

- Given our business combination, we estimate fourth quarter actual and fiscal year weighted average shares outstanding of approximately 175.4 million and 148.5 million, respectively.

56.    Also on November 5, 2020, Velodyne held a conference call with analysts and investors to discuss the Company's third quarter 2020 financial results.  The call was hosted by defendants Gopalan and Hamer.  In his prepared remarks, defendant Gopalan claimed that Velodyne was running ahead of target, stating in pertinent part as follows:

Our strong performance in Q3, met or exceeded our target.  Revenue in the third quarter grew 137% year-over-year to $32.1 million.  We added six new agreements across all three of our broad markets in the third quarter, bringing our total multi-year agreements to 24.  At the end of a quarter, we were tracking 175 projects in our pipeline, which represents a 34% increase over the 131 projects at end of 2019 and further illustrates the demand for Lidar and Velodyne's ability to match Lidar solutions to very different applications in price points.

57.    Defendant Gopalan also highlighted the Company's relationship with Ford, stating that "Velodyne is partnered with leading companies like Ford," and claimed that the Company had "incredibly reduced the risk in our model by serving multiple customers in multiple industries."

58.    In his prepared remarks, defendant Hamer represented that Velodyne was continuing to experience sustained customer engagement and revenue growth, stating in pertinent part as follows:

Importantly the company continues to see healthy levels of customer engagement as evidenced by an increase in long-term contracts.  Third quarter revenue of $32.1 million represents a 137% increase versus the comparable quarter last year.  Sensors are the company's focused revenue stream.  This quarter we sold a record number of Alpha Prime units predominantly to the automotive sector.

Another important area for the company is multi-year agreements with customers that are putting their supply chain in place for solutions that include Lidar.

*     *     *

And finally I'd like to turn now to guidance, which remains the same as we publicly disclosed in early September. As Anand mentioned, we are seeing increased interest and acceleration of last-mile delivery plans as a result of the pandemic while other industries are cautious about capital spending. With these dynamics in mind, for the fourth quarter and full year 2020, revenue is estimated to be approximately $101 million based on our pipeline and production contracts and the reduction of ASPs offset by volume. We expect higher sensor volumes in Q4. We expect the full year GAAP gross margin, including around $7.5 million of stock-based compensation expense to be around 22.6% to 25.6%, and the non-GAAP gross margin to be approximately 30% to 33%.

59. On November 9, 2020, Velodyne filed with the SEC a quarterly report for the third quarter of 2020 on Form 10-Q. The report was signed by defendants Gopalan and Hamer, who also signed certifications attesting to the report's accuracy and completeness. The report included the financial results provided in the 3Q20 Release. The report highlighted the material importance of Hall's continued stewardship of the Company, stating in pertinent part as follows:

Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles organized by the Defense Advanced Research Projects Agency (DARPA). In a historic engineering milestone, Mr. Hall invented a lidar sensor that could see and measure the vehicle's surroundings with unprecedented precision, enabling the vehicle to navigate the course autonomously.

*     *     *

***Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management***.

Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and he remains deeply involved in all aspects of Velodyne's business, including product development. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's research and development activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.

60.     Defendants' statements referenced in ¶¶46-59 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Velodyne's business, operations and prospects, which were known to defendants or recklessly disregarded by them, as follows:

(a)     that Hall had been excluded from decision-making at Velodyne and was locked in a power struggle for leadership of the Company with defendant Gopalan and other executives;

(b)     that Velodyne was losing major customer contracts to competition, including contracts that defendants had used to highlight "awarded" revenues during the Class Period;

(c)     that Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Merger;

(d)     that, as a result of (a)-(c) above, Velodyne was not on track to achieve over $100 million in revenues for 2020 and in fact was suffering from year-over-year revenue declines;

(e)     that Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weaknesses related to the Company's tracking and reporting of whistleblower complaints and revenue recognition and reporting practices; and

(f)     that, as a result of (a)-(e) above, defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

61.     On January 7, 2020, Velodyne issued a release providing the Company's preliminary fourth quarter and full year 2020 financial results ("FY2020 Release").  The release stated that Velodyne had only achieved approximately $94 million in annual 2020 revenues, 7% below the Company's previous annual revenue guidance and 30% below its fourth quarter revenue guidance.  Velodyne also withdrew any future guidance, notwithstanding defendants' prior representations regarding the strong proportion of Company revenues purportedly under contract and favorable business trends.

62.     On this news, the price of Velodyne stock and warrants fell 7% and 13%, respectively.  However, because defendants failed to disclose the full truth about the adverse

events, trends and uncertainties negatively impacting Velodyne's business, the price of Velodyne securities remained artificially inflated.

63.     In addition, defendants continued to make materially false and misleading statements which concealed the true facts regarding Velodyne's business, operations and prospects.  For example, the FY2020 Release stated in pertinent part as follows:

> Commenting on the business and financial update, Velodyne CEO Dr. Anand Gopalan stated, "Despite the impact of COVID-19 in the past few months and on our near-term visibility, there is no change in our fundamental outlook for the future.  We are encouraged by the expanding adoption of lidar across a wide variety of industries, some of which are accelerating in a post-COVID world.  As a result, we believe our pipeline is the most robust in the industry and we are manufacturing and shipping more lidar units than all our competitors have reported."  He added, "With a manufacturing operation of our scale, not just in the US but with global partners, we must prioritize the safety of our employees and the general public in our operations.  We continue to follow heightened safety protocols, and I am proud of the exceptional work from our team as they produced a record 4,100+ sensors and delivered them to customers in a truly challenging fourth quarter for our business and individuals around the world."

64.     On January 12, 2021, defendants Hamer and Gopalan presented on Velodyne at the 19th Annual J.P. Morgan Tech/Auto Forum.  During his opening remarks, Gopalan highlighted the Company's "real tangible visible financial growth," stating in pertinent part as follows:

> All of this leads to a company which has real tangible visible financial growth.  Well, as I said before, huge momentum in our own sales pipeline, going from 130 projects at the beginning of 2020, to 183 projects and converting those projects into multiple signed and awarded agreements going from six to 25 as we stand today.  All of this coming together to create tangible revenue today, and we guided to – in our latest announcement to $94 million in revenue.

65.     Defendants' statements referenced in ¶¶63-64 above were materially false and misleading when made because they misrepresented and failed to disclose the adverse facts about Velodyne's business, operations and prospects, which were known to defendants or recklessly disregarded by them, as follows:

> (a)     that Hall had been excluded from decision-making at Velodyne and was locked in a power struggle for leadership of the Company with defendant Gopalan and other executives;

(b)      that Velodyne was losing major customer contracts to competition, including contracts that defendants had used to highlight "awarded" revenues during the Class Period;

(c)      that Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Merger;

(d)      that, as a result of (a)-(c) above, Velodyne was not on track to achieve over $100 million in revenues for 2020 and in fact was suffering from year-over-year revenue declines;

(e)      that Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weaknesses related to the Company's tracking and reporting of whistleblower complaints and revenue recognition and reporting practices; and

(f)      that, as a result of (a)-(e) above, defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

66.      On February 12, 2021, notwithstanding defendants' representations during the Class Period that Ford would maintain long-term equity ownership in the Company, Ford filed with the SEC a statement of ownership on Form SC 13G/A which revealed that Ford had sold its entire Velodyne stake.

67.      On this news, the price of Velodyne stock and warrants fell 8% and 12%, respectively.  However, because defendants failed to disclose the full truth about the adverse events, trends and uncertainties negatively impacting Velodyne's business, the price of Velodyne securities remained artificially inflated.

68.      On February 22, 2021, Velodyne issued a release announcing an abrupt management change at the Company, including the removal of Hall from his position as Chairman of the Board and the termination of his wife Marta Thoma Hall as Velodyne's Chief Marketing Officer.  The reasons provided for the terminations included the couple's failure "to operate with respect, honesty, integrity, and candor in their dealings with Company officers and directors."  In addition to a formal censure of the couple, the Board directed them to receive remedial training. The Halls would later publicly respond that the Company's actions represented an "ambush" and "power grab" by Velodyne management.  The couple also claimed that Velodyne executives had

been attempting to cut them out of decision-making, notwithstanding defendants' efforts to highlight Hall's continued leadership of Velodyne during the Class Period.

69. On this news, the price of Velodyne stock and warrants fell 15% and 20%, respectively. However, because defendants failed to disclose the full truth about the adverse events, trends and uncertainties negatively impacting Velodyne's business, the price of Velodyne securities remained artificially inflated.

70. On February 25, 2021, Velodyne issued a release providing the Company's final fourth quarter and full year 2020 financial results. The release stated that Velodyne had generated only $17.8 million in revenue during the fourth quarter, a 6% year-over-year *decline* rather than the 30% increase projected by defendants during the Class Period.

71. Also on February 25, 2021, Velodyne held a conference call with analysts and investors to discuss the Company's fourth quarter and full year 2020 financial results. The call was hosted by defendants Gopalan and Hamer. During his prepared remarks, defendant Gopalan acknowledged that Velodyne had recently lost customer contracts, including one customer that "made a choice to use a different technology for their next generation platform" and another that selected "an older technology for their first generation rollout."

72. During the question and answer portion of the call, an analyst asked about Velodyne's purportedly "signed and awarded" long-term customer contract revenues, which defendants had previously estimated before the shareholder vote on the Merger supported $680 million in revenues by 2024. In response, defendant Hamer reversed course on these committed revenues, stating: "So we aren't providing any guidance that far out at this point." In response to another analyst question, defendant Hamer would later reveal that the average sales price for Velodyne products had fallen from $7,100 in 2019 to just $4,800 in 2020, a one-third decline. In response to these revelations, one analyst asked if anything had changed since the Company's June Analyst Day, to which defendant Gopalan responded in pertinent part: "[W]e have always had a clear and clearer understanding of where the end cost of the technology needs to get to for all of these different applications to enable mass market adoption. . . . So, no, nothing has really changed in terms of outlook."

73.     On March 4, 2021, Velodyne filed with the SEC a current report on Form 8-K disclosing that Hall had resigned from the Board.  That same day, Hall filed with the SEC an amended Form SC 13D/A, which stated in pertinent part as follows:

> Since the consummation of the Merger, the Reporting Persons have tried to work cooperatively with the Board to express their concerns with the Issuer's corporate governance, strategy and financial performance but have felt disregarded. In attempting to enhance the Board, the Reporting Persons tried to recommend highly qualified directors to join the Board and took every effort to avoid a public nomination of Mr. Hall's nominee, Eric Singer.  Shortly thereafter, the Issuer chose to remove the Reporting Persons from their roles at the Issuer – Mr. Hall as Chairman and Mrs. Hall as Chief Marketing Officer, on February 19, 2021 and took the highly unusual step to publicly censure the Reporting Persons as directors, presenting few facts to support the censure.  Recently, the Board further sought to manipulate the corporate machinery in moving director Chris Thomas to a new class to avoid having to face re-election at the upcoming annual meeting of stockholders.  Since the Reporting Persons were removed from their roles at the Issuer, the Issuer's stock has declined over 30%.

74.     On March 15, 2021, Velodyne issued a release announcing that it had hired a new COO, James Barnhart, effective immediately.

75.     On March 17, 2021, Velodyne filed its annual report with the SEC on Form 10-K. In the annual report, Velodyne revealed that the Company was suffering from multiple material weaknesses in its internal controls over financial reporting, including weaknesses related to: (a) Velodyne's processes and controls over tracking and reporting whistleblower complaints and litigation matters; and (b) Velodyne's failure to adequately review revenue schedules associated with non-standard revenue arrangements, which resulted in misstatements of revenue and deferred revenue for the three months ended December 31, 2020.

76.     Also on March 17, 2021, Velodyne filed a current report with the SEC on Form 8-K.  The Form 8-K revealed that the Company's former COO, Thomas Tewell, had resigned on March 14, 2021.

77.     On this news, the price of Velodyne stock and warrants fell 13% and 17%, respectively, over three trading days.

78.     The market for Velodyne securities was open, well-developed and efficient at all relevant times.  As a result of the alleged materially false and/or misleading statements, and/or omissions of material fact alleged herein, Velodyne securities traded at artificially inflated prices

during the Class Period.  Plaintiff and other members of the Class purchased Velodyne securities relying upon the integrity of the market price of these securities and market information relating to Velodyne, and have been damaged thereby.

79.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Velodyne securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

80.     At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Velodyne's business, competition, acquisition plans and operations.  These material misstatements and omissions had the cause and effect of creating in the marketplace an unrealistically positive assessment of Velodyne, its business, profitability, competitive risks, services and financial prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing Velodyne securities at artificially inflated prices, thus causing the damages complained of herein.

**ADDITIONAL SCIENTER ALLEGATIONS**

81.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Velodyne's management, competitive landscape, their control over, and/or receipt and/or modification of

Velodyne's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Velodyne, participated in the fraudulent scheme alleged herein.

82.     The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.  Given their executive-level positions with Velodyne, Velodyne Target and/or the Blank Check Defendants, the Individual Defendants controlled the contents of Velodyne's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

83.     Plaintiff also alleges that scienter of the Individual Defendants (who, as executive officers of the Company, knew or recklessly ignored facts related to the core operations of Velodyne) can be imputed to Velodyne.

84.     Further evidencing their scienter, defendants had the motive and opportunity to commit fraud.  The Merger allowed the Blank Check Defendants to secure tens of millions of dollars in equity in the combined Company that they would not otherwise receive and for the officers and directors of Velodyne Target to receive desirable positions in a publicly traded company, Velodyne.  It also allowed the Individual Defendants to receive lucrative payouts, compensation and incentive awards in connection with their positions as officers and directors of Velodyne following the Merger.

85.     Given defendants' knowledge of and their misleading statements about Velodyne's acquisition plans, business and prospects made contemporaneously with that knowledge,

1  defendants' materially false and/or misleading statements alleged herein were made willfully and

2  caused Velodyne securities to trade at artificially inflated prices during the Class Period.

3                                **LOSS CAUSATION**

4         86.    As detailed herein, during the Class Period, defendants engaged in a scheme to

5  deceive the market and a course of conduct that artificially inflated the price of Velodyne

6  securities.  This scheme operated as a fraud or deceit on Class Period purchasers of Velodyne

7  securities by failing to disclose and misrepresenting the adverse facts detailed herein.  When

8  defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent

9  to the market, the price of Velodyne securities declined significantly as the prior artificial inflation

10  came out of the price of Velodyne securities.

11        87.    By concealing from investors the adverse facts detailed herein, defendants

12  presented a misleading picture of Velodyne's business, prospects and operations.  Defendants'

13  false and misleading statements had the intended effect and caused Velodyne securities to trade at

14  artificially inflated levels throughout the Class Period, with Velodyne common stock reaching a

15  high of $30.43 per share on September 9, 2020.  Following the adverse revelations detailed herein,

16  the price of Velodyne common stock fell to a low of just over $13 per share on March 18, 2021 –

17  57% below the Class Period high.  As a result of their purchases of Velodyne securities at

18  artificially inflated prices during the Class Period, plaintiff and the other Class members suffered

19  economic loss, *i.e.*, damages, under the federal securities laws.

20        88.    When the truth about the Company was revealed to the market, the price of

21  Velodyne securities fell significantly.  The decline began to remove the inflation from the price of

22  Velodyne securities, causing real economic loss to investors who had purchased these securities

23  during the Class Period.  The declines in the price of Velodyne securities when the corrective

24  disclosure came to light was a direct result of the nature and extent of defendants' fraudulent

25  misrepresentations being revealed to investors and the market.  The timing and magnitude of the

26  price decline in Velodyne securities negate any inference that the loss suffered by plaintiff and the

27  other Class members was caused by changed market conditions, macroeconomic or industry

28  factors, or Company-specific facts unrelated to defendants' fraudulent conduct.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                              - 23 -

89.     The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the price of Velodyne securities and the subsequent significant decline in the value of these securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

90.     At all relevant times, the market for Velodyne securities was an efficient market for the following reasons, among others:

(a)     Velodyne securities met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient, national stock market;

(b)     as a regulated issuer, Velodyne filed periodic public reports with the SEC and the Nasdaq;

(c)     Velodyne regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Velodyne was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

91.     As a result of the foregoing, the market for Velodyne securities promptly digested current information regarding Velodyne from all publicly available sources and reflected such information in the price of Velodyne securities.  Under these circumstances, all purchasers of Velodyne securities during the Class Period suffered similar injury through their purchase of these securities at artificially inflated prices and a presumption of reliance applies.

92.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or

1   omissions.   Because this action involves defendants' failure to disclose material adverse

2   information regarding the Company's business operations and financial prospects – information

3   that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to

4   recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable

5   investor might have considered them important in making investment decisions.  Given the

6   importance of the Class Period material misstatements and omissions set forth above, that

7   requirement is satisfied here.

8                                                     **NO SAFE HARBOR**

9            93.      The statutory safe harbor provided for forward-looking statements under the Private

10  Securities Litigation Reform Act of 1995 does not apply to any of the allegedly false statements

11  pled in this complaint.  The statements alleged to be false and misleading herein all relate to then-

12  existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false

13  may be characterized as forward looking, they were not adequately identified as "forward-looking

14  statements" when made and there were no meaningful cautionary statements identifying important

15  factors that could cause actual results to differ materially from those in the purportedly forward-

16  looking statements.  Furthermore, to the extent that the statutory safe harbor is determined to apply

17  to any forward-looking statements pleaded herein, defendants are liable for those false forward-

18  looking statements because at the time each of those forward-looking statements was made, the

19  speaker had actual knowledge that the forward-looking statement was materially false or

20  misleading, and/or the forward-looking statement was authorized or approved by an executive

21  officer of Velodyne who knew that the statement was false when made.

22                                           **CLASS ACTION ALLEGATIONS**

23          94.      Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

24  Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of the securities of

25  Velodyne during the Class Period.  Excluded from the Class are defendants and members of their

26  immediate families, the officers and directors of the Company, at all relevant times, and members

27  of their immediate families, the legal representatives, heirs, successors or assigns of any of the

28  foregoing, and any entity in which defendants have or had a controlling interest.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

95.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Velodyne securities were actively traded on the Nasdaq.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Velodyne or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

97.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business, operations and management of Velodyne; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule l0b-5 Promulgated Thereunder Against Velodyne, the Individual Defendants and Graf Acquisition

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    During the Class Period, the defendants named herein disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

102.    These defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Velodyne securities during the Class Period.

103.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Velodyne securities.  Plaintiff and the Class would not have purchased Velodyne securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

104.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Velodyne securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against the Individual Defendants and the Blank Check Sponsor Defendants

105.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                              - 27 -

106.    The Individual Defendants and the Blank Check Sponsor Defendants acted as controlling persons of Velodyne within the meaning of §20(a) of the Exchange Act.

107.    By virtue of their positions as officers and/or directors of Velodyne, and/or their beneficial ownership of Velodyne common stock, the Individual Defendants and the Blank Check Sponsor Defendants had the power and authority to, and did, cause Velodyne to engage in the wrongful conduct alleged.

108.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Velodyne securities during the Class Period.

109.    By reason of such conduct, the defendants named herein are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.    Designating plaintiff as Lead Plaintiff and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding plaintiff and other members of the Class damages together with interest thereon;

C.    Awarding plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

D.    Awarding plaintiff and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: March 19, 2021                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                         SHAWN A. WILLIAMS


                                         s/ SHAWN A. WILLIAMS
                                         SHAWN A. WILLIAMS

                                         Post Montgomery Center
                                         One Montgomery Street, Suite 1800
                                         San Francisco, CA  94104
                                         Telephone:  415/288-4545
                                         415/288-4534 (fax)
                                         shawnw@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                         DAVID C. WALTON
                                         BRIAN E. COCHRAN
                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101-8498
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         davew@rgrdlaw.com
                                         bcochran@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com

                                         JOHNSON FISTEL, LLP
                                         FRANK J. JOHNSON
                                         655 West Broadway, Suite 1400
                                         San Diego, CA  92101
                                         Telephone:  619/230-0063
                                         619/255-1856 (fax)
                                         frankj@johnsonfistel.com

                                         Attorneys for Plaintiff

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                    - 29 -

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

CAROL E. NICK ("Plaintiff") declares:

1.     Plaintiff has reviewed a complaint and authorized its filing.

2.     Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

<em>See</em> attached Schedule A.

5.     Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __19__ day of March, 2021.

DocuSigned by:

_____

CAROL E. NICK

VELODYNE LIDAR

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|:---:|:---:|:---:|
| 01/04/2021 | 100 | $22.01 |

Prices listed are rounded up to two decimal places.